# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**CASY CARLTON, JONATHAN JONES,**
**and BOBBY HARRISON**                                    **PLAINTIFFS**

**v.**                    **Case No. 4:17-cv-00076 KGB**

**JHOOK INVESTMENTS, INC.,**
**JEFF HOOKER, and IVY HALL, INC.**                       **DEFENDANTS**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Casy Carlton, Jonathan Jones, and Bobby Harrison bring this action against defendants JHook Investments, Inc. ("JHook"), Jeff Hooker, and Ivy Hall, Inc. ("Ivy Hall"), under the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the overtime provisions of the Arkansas Minimum Wage Act ("AMWA"), Arkansas Code Annotated § 11-4-201 *et seq.* (Dkt. No. 1). Defendants filed a motion for summary judgment (Dkt. No. 17). Plaintiffs also filed a motion for partial summary judgment (Dkt. No. 20). The Court denied both defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment (Dkt. No. 40).

Plaintiffs then filed a motion for order to provide documents and incorporated brief (Dkt. No. 43). The Court held a hearing on this motion on February 1, 2019. For the reasons stated by the Court at that hearing, the Court grants plaintiffs' motion for order to provide documents *Id.*).

Separate plaintiff Mr. Jones has filed a motion to dismiss without prejudice (Dkt. No. 49). In this motion, Mr. Jones requests that the Court dismiss his claims without prejudice (*Id.*). The Court finds that Mr. Jones' motion to dismiss without prejudice accords with the terms of Federal Rule of Civil Procedure 41(a)(2). The Court therefore dismisses without prejudice Mr. Jones'

claims against defendants. Accordingly, to the extent the Court in this Order refers to "plaintiffs," the Court is referring only to Mr. Carlton and Mr. Harrison.

This matter came before the Court for a bench trial. The parties were represented by counsel. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings and conclusions. The Court denies defendants' oral motion for a directed verdict under Federal Rule of Civil Procedure 52(c). The Court determines that plaintiffs have sustained their burden of proof and are entitled to damages, as set forth below.

## I. Findings Of Fact

1. A bench trial was held on this matter on February 4, 2019.

2. Plaintiffs filed proposed findings of fact (Dkt. No. 45). Defendants agreed with many of those proposed findings of fact, except to the extent set forth below (Dkt. No. 48). To the extent defendants did not object to plaintiffs' proposed findings of fact, such findings are adopted by the Court as its findings and cited below.

3. The following individuals testified at trial: Mr. Hooker, Mr. Carlton, Mr. Harrison, Tim Moody, Jim Heverly, Tony Martin, and Tammy Moody.

4. At trial, plaintiffs introduced six exhibits. Both sides agreed to rely upon these exhibits:

   a. Exhibit 1 contains partial payroll records for each of the plaintiffs when they worked for defendants (Ex. 1).

   b. Exhibit 2 is an earning statement for Mr. Harrison dated November 13, 2015 (Ex. 2).

   c. Exhibit 3 includes "Employee Commission Log" sheets that have Mr. Carlton's name written in the heading (Ex. 3).

d.  Exhibit 4 includes "Employee Commission Log" sheets that have Mr. Harrison's name written in the heading (Ex. 4).

e.  Exhibit 5, which originally included Mr. Jones' commission logs, was substituted by agreement of the parties for a collection of payroll records for Mr. Harrison.

f.  Exhibit 6 is a spreadsheet prepared by plaintiffs that lists the following information for each plaintiff by pay period:  work location, regular on-duty hours, call-out time, hours per week, regular pay, commission, total earnings, regular pay rate, overtime pay rate, unpaid overtime wages, liquidated damages, and total damages (Ex. 6).

5.  Plaintiffs also presented three new exhibits attached to their post-trial briefing.  The first post-trial exhibit is a summary of Exhibit 3 that was introduced at trial (Dkt. No. 55-1).  This post-trial exhibit is a spreadsheet that lists every day that Mr. Carlton worked for defendants and lists how much time per day, according to his commission sheets, Mr. Carlton worked after-hours (*Id.*).  This exhibit also includes weekly totals of after-hours time worked by Mr. Carlton, as well as the amount of after-hours work he performed on his on-call and off-call weeks (*Id.*).

6.  The second post-trial exhibit is a spreadsheet that calculates revised damages for Mr. Harrison, taking into account the new payroll records for Mr. Harrison that are included in Exhibit 5 (Dkt. No. 55-2).  The third post-trial exhibit is a spreadsheet calculating after-hours worked by Mr. Harrison as reflected in Mr. Harrison's commission sheets introduced as Exhibit 4 at trial (Dkt. No. 55-3).

## A.  Defendants

7.  Separate defendant JHook is a for-profit corporation registered to conduct business in the State of Arkansas (Dkt. No. 45, ¶ 1).  JHook operates a towing services company based in North Little Rock, Arkansas, under the business name of JHook Towing and Recovery (*Id.*, ¶ 2).

JHook also completes some recovery services and has a repair shop operating as a small mechanic garage for tractor trailers. JHook had a previous location in Lonoke before it was suspended by state police for improper staffing. From June 2015 until early 2017, JHook had 11 to 12 drivers out of approximately 13 to 20 total employees.

8. Separate defendant Mr. Hooker is an individual and resident of Arkansas (*Id.*, ¶ 3). Mr. Hooker is an officer and director of JHook (*Id.*, ¶ 4). Mr. Hooker testified that he is sole owner of JHook, though he conceded that his wife may be a co-owner. Mr. Hooker is an officer, director, and owner of Ivy Hall.

9. Separate defendant Ivy Hall is a for-profit corporation registered to conduct business in the State of Arkansas (*Id.*, ¶ 5). Ivy Hall provides towing services in and around Jacksonville (*Id.*, ¶ 6). Ivy Hall files a separate tax return than JHook, and has a separate federal tax I.D., payroll, bank account, phone number, fax machine, email address, and logo. From June 2015 into early 2017, Ivy Hall employed three to four employees.

10. JHook and Ivy Hall's revenue primarily consists of towing fees, sales of wrecked vehicles, and repairs of large trucks (*Id.*, ¶ 7). Both JHook and Ivy Hall's primary revenue is derived from fees for tows for the general public, police departments, and car dealerships, and, for JHook only, big tows such as tractor-trailers. JHook and Ivy Hall obtain revenue each year from selling unclaimed vehicles to car dealerships and tractor repair.

11. Defendants contend that Ivy Hall is a separate towing wrecking company.

12. Defendants also called Mr. Moody, Mr. Heverly, Mr. Martin, and Ms. Moody to testify.

13.     Mr. Moody is the general manager of JHook and Ivy Hall and has been for 11 to 12 years.  Mr. Moody conducts initial interviews of prospective employees for the businesses, and Mr. Hooker will sometimes come in once the prospective employee is determined to be qualified.

14.     Mr. Heverly is employed at JHook and has worked as a roll back driver for close to five years.

15.     Mr. Martin is employed at Ivy Hall and has worked as a rollback driver for ten years.

16.     Ms. Moody is employed at JHook and has worked as a dispatcher for six years.

17.     Mr. Hooker testified that JHook and Ivy Hall infrequently borrow and loan employees to each other.  When this occurs, according to Mr.Hooker, the employee is still paid by the company that employs him.

18.     Mr. Hooker and Mr. Moody have set the method and manner of payment for JHook and Ivy Hall drivers.  Mr. Hooker testified to having three methods to pay a driver:  (1) an hourly rate; (2) an overtime rate; and (3) a commission.  Rollback drivers are to be paid salary plus commission for every call they run.  Drivers are self-reporting and turn in a weekly commission sheet in order to calculate their pay.

### B.     Mr. Carlton's Job Duties

19.     Mr. Carlton entered into an employer-employee relationship with JHook and Mr. Hooker in February 2016 (*Id*., ¶ 8).  In February 2016, JHook and Mr. Hooker hired Mr. Carlton as a tow truck driver (*Id.*, ¶ 9).  Mr. Carlton worked for JHook and Mr. Hooker until February 2017 (*Id*.).  Mr. Carlton performed towing services and other duties incidental to towing on JHook and Mr. Hooker's behalf (*Id*., ¶ 10).  Mr. Carlton worked in three different locations:  Jacksonville, North Little Rock, and Lonoke (*Id*., ¶ 11).

20.     Mr. Carlton entered an employer-employee relationship with Ivy Hall and Mr. Hooker in February 2016.  Mr. Carlton was dispatched out of JHook's Lonoke location during November 2016, and he was dispatched out of the North Little Rock location from December 2016 until February 2017 (Ex. 6).

21.     While employed, Mr. Carlton drove a rollback truck, and his primary duties were performing towing services and other duties incidental to towing on behalf of JHook and Ivy Hall.

22.     Plaintiffs assert that after JHook and Mr. Hooker hired Mr. Carlton as a tow truck driver, Ivy Hall regularly dispatched Mr. Carlton to perform towing services on its behalf (Dkt. No. 45, ¶ 12).  Defendants deny this assertion and state that, if it occurred, it was infrequent (Dkt. No. 48, ¶ 2).  At the hearing, testimony was presented that, while at Ivy Hall, Mr. Carlton would receive calls from JHook to perform towing services on JHook's behalf.  While at JHook, Mr. Carlton would also receive calls from Ivy Hall to perform towing services on its behalf (*Id.*).

23.     Mr. Carlton performed towing services for defendants solely within the State of Arkansas (Dkt. No. 45, ¶ 13).  JHook assigned Mr. Carlton to drive a "rollback" truck (*Id.*, ¶ 14).

24.     JHook's rollback trucks were manufactured, either wholly or partially, in a location outside the State of Arkansas (*Id.*, ¶ 15).

25.     Mr. Carlton's rate of pay was $250.00 per week, plus commissions (*Id.*, ¶ 16).  The commission percentage he received was 25% of the total cost of the tow.  Mr. Hooker testified that he could not testify as to whether Mr. Carlton ever worked more than 40 hours in a week.  Mr. Hooker also testified that he could not remember if Mr. Carlton was ever paid hourly due to a large truck accident.

26.     Mr. Carlton did not possess a commercial drivers' license ("CDL") when he performed towing services for defendants (*Id.*, ¶ 45).  None of the defendants ever required Mr. Carlton to possess or obtain a CDL to perform duties as a driver (*Id.*, ¶ 46).

### C.     Mr. Harrison's Job Duties

27.     Defendants represented that Mr. Harrison worked for defendants as a tow truck driver from at least June 2015 through February 2017.  Mr. Harrison worked in three different locations:  Ivy Hall in Jacksonville, JHook in North Little Rock, and JHook in Lonoke (*Id.*, ¶ 32).  Mr. Harrison performed towing services and other duties incidental to towing on JHook and Mr. Hooker's behalf (*Id.*, ¶ 36).

28.     From May 2015 to June 2016, Mr. Harrison's rate of pay was $250.00 per week, plus commissions.  The commission percentage he received was 25% of the total cost of the tow.  Around the end of June 2016 or the first of July 2016, Mr. Harrison's rate of pay was changed to receive $15.00 an hour, plus commissions at 30% of the total cost of the tow.  Mr. Harrison's pay change occurred because he received his CDL.

29.     While at Ivy Hall, Mr. Harrison drove an F-650 large-wrecker and a 1500 Chevy tow truck.  The F-650 wrecker was for towing large semi-trucks and box trucks.  He also testified that he drove the Chevy 1500 tow truck approximately once a week, and he testified that the Chevy 1500 tow truck had a gross vehicle weight rating ("GVWR") of 10,000 pounds or less.

30.     Mr. Hooker testified that, if Mr. Harrison did drive a Chevy 1500 tow truck, he did so infrequently.  Mr. Hooker also testified that he has no evidence that Mr. Harrison did not drive the Chevy 1500 tow truck at least once a week.  Mr. Hooker stated that he knows that Mr. Harrison only infrequently used the Chevy 1500 tow truck because Mr. Hooker was onsite when Mr. Harrison worked from 2016 until 2017.

31.     While at JHook in North Little Rock, Mr. Harrison testified to driving an F-650 rollback, large wreckers, and a parts truck.  He also testified to driving the parts truck for business purposes one to two times a week and that the parts truck had a GVWR of 10,000 pounds or less.  Mr. Hooker testified there was a Chevy 1500 pickup truck located in North Little Rock that Mr. Harrison used infrequently.

32.     While at JHook in Lonoke, Mr. Harrison testified to driving a large wrecker, a rollback, and an F-250 service truck.  He also testified to driving the  F-250 service truck once or twice a week and that the F-250 had a GVWR of 10,000 pounds or less.

33.     It was not common for Mr. Harrison, as part of his employment, to take a vehicle out of the state of Arkansas.  Mr. Harrison once took either a truck or a trailer to Las Vegas on JHook's behalf.

### D.     Work Schedules

34.     The regular work schedule for defendants' tow truck drivers was 8:00 a.m. to 5:00 p.m., with a one-hour lunch.  Mr. Carlton testified that he was always subject to being called out during his lunch breaks, which he testified meant that, if he went to get lunch and he received a call, he would have to take the call, especially if it was a police call.  Mr. Carlton also testified that he often took his lunch with him on calls because he could not afford to eat out.  Mr. Harrison testified that, during the day, he would eat food while working and that he could not recall any particular days when this did not happen.

35.     Mr. Heverly testified that he was able to take a full lunch hour on a regular basis but would have had to leave lunch for a tow if called by the dispatcher.

36.     Ms. Moody testified that she would go to the next driver if she called a driver while he or she was in the middle of lunch.  She also testified that, if there was not another driver

available, the driver on lunch would take the call and then return to lunch. Ms. Moody stated that she does not pull away drivers from their lunches often, except for police calls.

37.     Mr. Moody testified that drivers were supposed to take their hour lunch whenever there was a break between calls.

38.     Mr. Heverly testified to leaving the site regularly to take lunch, and he remembered Mr. Harrison leaving the yard to eat lunch. He also testified that he recalled Mr. Carlton bringing his lunch and eating in the break room. Mr. Heverly testified that he did not know how long plaintiffs' lunches lasted.

39.     Mr. Carlton testified that he used time outside of calls to mow grass, pick up parts in the yard, and perform other duties besides driving a tow truck. Mr. Moody and Mr. Hooker testified that there was down time for plaintiffs when they were not working during business hours and that plaintiffs were paid for that time. Mr. Hooker also testified that waiting and being ready to go to a tow is a part of the job.

40.     Mr. Moody testified that there is not much grass to cut at Ivy Hall and that there is an individual, Willie Kline, who is paid to cut the grass and do clean up.

41.     Mr. Carlton testified that drivers were to be on-call and paid commission on tows after 5:00 p.m. or before 8:00 a.m.

42.     Mr. Moody testified that drivers were on-call every other week.

43.     Mr. Carlton and Mr. Harrison testified that they did not keep any record of the hours worked for JHook or Ivy Hall. Mr. Hooker testified that he did not know how many hours Mr. Carlton worked during his employment. Mr. Hooker also testified that he did not have any records of how many hours Mr. Harrison worked prior to Mr. Harrison obtaining his CDL.

44.     Mr. Hooker testified that a driver would be the only person to know whether he or she did or did not work overtime.  Mr. Hooker also testified that he has made no efforts to ensure that rollback drivers are not driving more than 40 hours in a week.

45.     Ms. Moody testified that drivers would have a better understanding of the weekly average number of hours they worked on-call in the evenings and the weekends.

46.     In addition to the regular work schedule, Mr. Carlton testified to working an extra two hours every other Saturday to run the Ivy Hall office.  While at Ivy Hall, Mr. Carlton estimated, based on his recollection, that he worked an average 47 hour or 45 hour regular on-duty hour work week based on Saturday work days.

47.     Mr. Carlton testified to being on-call for an average of 15 hours weekly as a best estimate of unpaid hours for the whole time period.  This estimate was based off his recollection of a seven-day work week, working through his lunch hours, two to three after-hour calls a night, and being on-call during Saturday and Sunday.

48.     While at JHook in Lonoke, Mr. Carlton testified to being constantly on-call.  Mr. Carlton also testified to being on-call approximately 26 unpaid hours per week while at the North Little Rock location.  The estimate was based off a seven-day work week, working through his lunch hours, and an increase of after-hours calls.

49.     Mr. Hooker testified that drivers are self-reporting and are to turn in a weekly commission sheet in order to calculate their pay.  Mr. Carlton testified that his  work done to assist other drivers, releasing vehicles, and running non-work-related errands for Mr. Moody will not appear on his commission sheets.  Mr. Carlton testified that Mr. Moody would call him to tow one of Mr. Moody's friend's vehicles and that such work would go unrecorded on his commission sheets

50.     Mr. Moody testified that drivers tow police cars for free, but he also testified that drivers are to put such tows on their commission sheets, so that they are compensated for those tows.

51.     Defendants testify that Mr. Carlton never discussed the issue of the alleged unpaid overtime with either Mr. Hooker or Mr. Moody.

52.     Mr. Harrison, based off his recollection, estimated that he worked 45 hours of regular on-duty work per week.

53.     Mr. Harrison estimated that he worked 14 unpaid hours per week based off a seven-day work week and counting five hours of lunches and nine hours of after-hours calls with an average of two hours a night.

54.     Mr. Harrison testified that he was paid for 29.5 hours of overtime for his drive to Las Vegas, but he recalls that this was the only week that he was paid all of his overtime.

55.     Mr. Harrison testified that he objected to Mr. Moody about his pay and that Mr. Moody would not provide him with extra pay.

56.     Mr. Hooker stated that he has no payroll reports that show that Mr. Harrison worked for Ivy Hall.

57.     Mr. Hooker testified to correcting an instance of underpayment for either Mr. Carlton or Mr. Harrison by cutting a separate check that would not be reflected on a payroll report. Mr. Heverly testified that mistakes had been made on his pay and that he received a handwritten check to resolve the issue.

58.     Mr. Heverly testified it was very rare to work an extra 14, 21, or 26 hours on top of a 40-hour schedule.  He testified that, when there is a significant tractor-trailer wreck, drivers might work several hours, but he also testified that drivers are compensated for the after-hours call by

being paid $30.00 an hour. Mr. Heverly also testified that, besides those rare instances, he has never worked 20 hours or more in a week on top of a 40-hour schedule.

59.     Mr. Martin testified that Mr. Moody never refused to correct a paycheck issue.

60.     Mr. Heverly testified that after-hours calls during evenings and weekends vary and that it is hard to measure how many hours he typically works during the evenings and weekends. He testified that he does not know what other drivers are doing on call-outs or during the night.

61.     Mr. Martin testified that he likely never had to work an extra 14 to 21 hours a week. He also testified that he has had to wake up in the night to take between one to three calls. Mr. Martin testified that he did not often have to wake up in the middle of the night to take a call.

62.     Mr. Martin testified that he is not on-call every other weekend and that he has never worked overtime that went unreported. Mr. Martin also testified that neither Mr. Moody nor anyone else at the business asks people to keep track of their overtime.

### E.     Unpaid Overtime Estimates

63.     Mr. Carlton testified that he did not keep any records of the hours he worked. Mr. Harrison also testified that he did not keep contemporaneous records of the hours he worked.

64.     At trial, plaintiffs presented Exhibit 6, which lists the following information for Mr. Carlton and Mr. Harrison by pay period:  regular on-duty hours, call-out time, hours per week, regular pay, commission, total earnings, regular pay rate, overtime pay rate, unpaid overtime wages, liquidated damages, and total damages.

65.     Plaintiffs testify that the figures set forth in Exhibit 6 are their best estimates of unpaid hours for the whole time period.

66.     Furthermore, at trial, defendants presented commission sheets for Mr. Carlton and Mr. Harrison (Exs. 3, 4).

### 1. Mr. Carlton's Estimated Damages

67. Exhibit 6 shows that Mr. Carlton alternately worked 47 or 45 regular on-duty hours per week from March 4, 2016, until the check date November 25, 2016 (Ex. 6, at 1). Then, starting with check date December 2, 2016, until he left JHook, Mr. Carlton worked 45 regular on-duty hours per week (*Id.*). Mr. Carlton testified that regular on-duty hours were from 8:00 a.m. until 5:00 p.m. He further testified that, for the weeks when Exhibit 6 indicates that he worked 47 regular hours, those were weeks he was required to work two hours on Saturday from 10:00 a.m. to noon. He explained that he never had a designated lunch break and that he ate his lunch while taking calls.

68. From the check dates of March 4, 2016, until November 4, 2016, Exhibit 6 shows that Mr. Carlton had 15 hours of call-out time every other week (Ex. 6, at 1). Mr. Carlton explained that this was his best estimate for that time frame, assuming that he worked every night and two nights on the weekend. He also explained that he sometimes worked more than 15 hours of call-out time in a week. Exhibit 6 also shows that, for check dates November 11, 2016, November 18, 2016, and November 25, 2016, he had 15 hours of call-out time each week (Ex. 6, at 1). Mr. Carlton explained that, during this time period, he had been transferred to JHook's Lonoke, Arkansas, location, and he was continuously on-call.

69. Exhibit 6 then shows that, from check date December 2, 2016, until he left JHook, Mr. Carlton worked at JHook's North Little Rock location (Ex. 6, at 1). Exhibit 6 shows that Mr. Carlton claims 26 hours of call-out time per week while he worked at JHook's North Little Rock location (*Id.*). He testified that, since he had moved to Sherwood, Arkansas, he received many more calls.

70.     A note on Exhibit 6 states that the total earnings for the weeks of October 7, 2016, and February 3, 2017, "are estimates based on the average of the rest of the weeks in which data is available." (Ex. 6, at 1).  The exhibit asserts that Mr. Carlton incurred unpaid overtime wages during each week he worked (*Id.*).

71.     For the entire period of Mr. Carlton's employment with defendants, Exhibit 6 estimates that he is owed unpaid overtime wages of $6,161.26, plus liquidated damages of the same amount, for a total of $12,322.51 (Ex. 6, at 1).

72.     Mr. Carlton also testified about plaintiffs' Exhibit 3, which includes multiple documents titled "Employee Commission Log" with "Casy Carlton" also written in the heading (Ex. 3).  Mr. Carlton testified that, when he was making his estimates of hours worked, he did not have access to those commission sheets.  He also testified that the commission sheets would not necessarily show all of his call-out time, including time he spent assisting another drive, releasing vehicles, or running errands requested by Mr. Moody.  Mr. Carlton also testified that, for his on-call weeks, there should be corresponding commission sheets and that he did not know why any such commission sheets would be missing.

73.     At trial, Mr. Carlton was asked if he ever recalled weeks where Mr. Hooker paid him $400.00 instead of his regular $250.00 salary; Mr. Carlton testified that he did not recall such an event happening.   Additionally, Mr. Carlton testified that he never failed to turn in his commission sheets because, if he failed to turn in his commission sheets, he would not be paid.

74.     At trial, counsel for defendants asked Mr. Carlton to review the commission sheets in Exhibit 3.  When asked if he could point to any of the commission sheets to support Mr. Carlton's estimate that he worked 15 hours of call-out work per week, Mr. Carlton replied that his estimate of 15 hours was based upon his recollection and that he did not have commission sheets

when he made that estimate. Mr. Carlton also stated that Exhibit 3 does not include any commission sheets after November 2016, and he testified that the missing commission sheets would show that he worked more than 26 hours of call-out work per week, negating any overestimate he made prior to November 2016.

75.     Plaintiffs' post-trial Exhibit 1 is a spreadsheet that lists the number of after-hours work done by Mr. Carlton from February 15, 2016, until November 21, 2016, as shown by his commission sheets in Exhibit 3. This spreadsheet indicates that, on Mr. Carlton's on-duty weeks, he worked an average of 10.04 hours after-hours and that on his off-duty weeks he worked 1.69 hours after-hours (Dkt. No. 55-1, at 6).

## 2.     Mr. Harrison's Estimated Damages

76.     Mr. Harrison testified that he estimated his regular on-duty hours as 45 hours a week, as represented on Exhibit 6, because he was scheduled to work from 8 a.m. to 5 p.m. on weekdays including the lunch hours. These estimates were for the check dates of May 29, 2015, until June 24, 2016 (Ex. 6).

77.     Mr. Harrison explained that he ate lunch on the go or while working and that he could not recall any particular day when that was not the case.

78.     Mr. Harrison further testified that his after-hours call-out time, as represented on Exhibit 6, was nine hours a week. These estimates were for the check dates of May 29, 2015, until June 24, 2016 (Ex. 6). Mr. Harrison explained that this was an average of two hours a night, seven days a week, of call-out time.

79.     Exhibit 6 states that Mr. Harrison's unpaid overtime wages for the period of May 29, 2015, until June 24, 2016, equals $7,023.67 (Ex. 6, at 3). It also states that the liquidated damages equal the same amount, for total damages of $14,249.03 (*Id*.).

80.     Exhibit 6 includes a note that the "commission earning for 5/29/15-11/16/15 are based on the information contained in Harrison's November 13 paystub, commission earnings for 11/20/15-12/25/15 are based on the average commission earnings for 5/29/15-11/13/15, and the commission earnings for 1/1/16-4/15/16 and 5/13/136-6/17/16 are based on the YTD information contained in an ADP record for 6/24/16 and payroll records for 4/22/16-5/6/16." (*Id.*).

81.     Exhibit 6 also contains Mr. Harrison's damages estimates from check dates July 1, 2016, until February 10, 2017 (Ex. 6, at 4).  This portion of Exhibit 6 shows the following information for each check date from July 1, 2016, until February 10, 2017:  regular hours recorded, overtime hours recorded, regular pay rate, overtime rate, regular pay, overtime paid, commission, commission regular rate, commission overtime rate, unpaid commission overtime, call-out hours and working lunches, off-the-clock overtime hours, unpaid off-the-clock overtime, and total unpaid overtime (*Id.*, at 4-5).  Mr. Harrison testified that the column labeled "call-out hours and working lunches" includes the nine hours a week of call-out time and the five hours per week of lunches.  The column labelled "Off-the-clock OT Hours" shows Mr. Harrison's estimate for the number of unpaid overtime hours he is owed for each week from July 1, 2016, to February 10, 2017 (Ex. 6, at 5).

82.     Exhibit 6 shows that 29.5 overtime hours were recorded for Mr. Harrison for check date August 26, 2016 (Ex. 6, at 4).  Mr. Harrison testified that the week of August 26, 2016, was the week he drove to Las Vegas, Nevada, and he did not list any call-out hours or working lunches for that week because he was paid his overtime for that week.

83.     Including liquidated damages, Exhibit 6 states that Mr. Harrison's damages for the period from July 1, 2016, until February 10, 2017, equal $22,613.85 (Ex. 6, at 5).

84.     At the start of trial, defendants produced additional payroll records for Mr. Harrison from June 2015 to June 2016 that the plaintiffs had not been given an opportunity to review prior to trial.  These payroll records have been substituted as plaintiffs' Exhibit 5.

85.     Plaintiffs have also presented post-trial Exhibit 2, which they represent "is a revised damages calculation for Harrison during the time in which he was paid a salary, which incorporates his pay records that were produced on the day of trial . . . ." (Dkt. No. 55, at 6).  Post-trial Exhibit 2 lists the following information for the check dates from June 5, 2015, until June 24, 2016:  regular on-duty hours, call-out time, hours, regular pay, commission, total earnings, regular rate, overtime rate, unpaid overtime wages, liquidated damages, and total damages (Dkt. No. 55-2).  Post-trial Exhibit 2 also includes a note that Mr. Harrison's "[c]ommission earnings for 10/2/15, 11/6/2015, and 12/25/15 were determined by the average of all other commission earnings in 2015, excluding outliers in which no commission was earned.  Because the parties' testimony agreed that Plaintiff was earning $250.00 per week during this period, the total earnings for those same weeks were determined by simply adding $250.00 to the commission." (*Id*., at 2).

86.     According to post-trial Exhibit 2, Mr. Harrison's total unpaid overtime wages from the beginning of his employment with defendants until June 24, 2016, is $7,123.24 (*Id*.).  Including liquidated damages for the same amount, post-trial Exhibit 2 states that Mr. Harrison's total damages for this period are $14,388.43 (*Id*.).

87.     Two of Mr. Harrison's commission sheets were introduced at trial (Ex. 4).  These two sheets include entries for "8-16," 8-22," "9-23," "9-24," and "9-26" (*Id*.).  Mr. Harrison confirmed that these commission sheets were written in his handwriting.  The second commission sheet also includes a calculation of Mr. Harrison's overtime for his trip to Las Vegas (Ex. 4, at 2).

88.     Plaintiffs' post-trial Exhibit 3 includes a calculation of Mr. Harrison's after-hours time recorded on Exhibit 4 (Dkt. No. 55-3).  Post-trial Exhibit 3 states that, for the entries on the September commission sheet in Exhibit 4, Mr. Harrison worked 13.5 hours of after-hour time (*Id.*).

### F.     Defendants' Business Practices

89.     Mr. Carlton testified that roughly 90% of calls he received originated from police departments or other businesses.  He also testified that approximately 90% of JHook and Ivy Hall's calls were police calls or business calls for tows.  This estimate is based off his conversations with other drivers, his own experience, and the cars in the impound lot.

90.     Mr. Harrison testified that between 80 to 90% of JHook and Ivy Hall's calls for tow truck services originated from the police or other businesses.  This estimate was based on his experiences and talking to other drivers and dispatchers.  Mr. Harrison testified that he could not think of a specific instance when the owner of a vehicle specifically told the police to call JHook or Ivy Hall for a tow.

91.     Mr. Carlton testified that at least 90% of defendants' revenue came from police and business calls.  Mr. Harrison testified based on his experience that approximately 90% of defendants' revenue came from police and business calls.

92.     Mr. Hooker disagreed that most of the towing business for JHook and Ivy Hall originated from calls from either police departments or municipalities.  Mr. Hooker also testified that his business would suffer and that revenues would go down significantly if police departments stopped using JHook and Ivy Hall.  Mr. Moody similarly disagreed that 90 to 95% of calls came from police departments, and he was not able to give another estimate.

93.     Mr. Heverly was unable to give an estimate of what percentage of his tows during the 2016 time period were for police departments.

94.     Mr. Hooker testified that tractor-trailers are typically driven in pursuit of a business, rather than nonbusiness, purpose. Mr. Hooker further testified that he was unaware if Mr. Harrison had ever towed a tractor-trailer that was driven for a nonbusiness purpose.

95.     Mr. Hooker testified to being unaware of what percentage of annual revenues for JHook and Ivy Hall were derived from the sales of vehicles, tractor repairs at the shop, tows that were initiated by police departments, commercial customers, individual person or family, or towing fees. Mr. Hooker testified to being unaware of the raw number of calls or number of tows for Ivy Hall or JHook in years 2015, 2016, or 2017. Mr. Moody testified to having probably 20 car dealers as customers, but he did not know what percentage of JHook's revenue was attributed to dealership customers.

96.     Mr. Hooker said that he would disagree with the assertion that 98% of Mr. Harrison's tows were for tractor trailers. He also said that he would take issue with the assertion that 90% of Mr. Harrison's rollback tows were for police department calls.

97.     Ms. Moody testified that there are people in the business at JHook who could keep logs and know how many calls drivers went out on and what kind of work they did during the day, but she also testified that such individuals were not present at trial.

98.     Mr. Hooker also explained that the drivers know if the tow they are conducting is for a police department.

99.     Mr. Hooker testified that a driver would be aware if he or she was towing for a police department by the time frame allotted to get to the tow, the presence of a police officer, the dispatcher call, and driver's experience at the accident.

100.    Mr. Hooker testified in a typical situation an individual or family having a vehicle towed by the police does not get to choose which business comes up next in the police department

rotation of towing companies, although a business being towed could choose the towing company. Mr. Hooker testified that, in police tow calls, a police agency facilitates the call but that the police do not pay for the tow, unless the tow is an error. Mr. Hooker further testified that typically an insurance company pays defendants. Mr. Hooker did state that a "private tow" would be paid directly by the customer.

101.     Mr. Hooker testified that 98% of the time when a police department initiates a tow, that tow is involuntary with respect to the owner. An involuntary tow is one where a police department has called for an abandoned vehicle to be towed, illegal parking, criminal investigations, and arrests.

102.     Mr. Hooker testified that the pricing for police tows is not the same as the pricing for individual tows. Mr. Hooker testified that his businesses charge more for towing tractor trailers. Mr. Hooker testified that a base rate for a police or commercial call is $150.00 and $95.00 in Sherwood. He also testified that the rates charged for police tows are set by the police departments and are not determined by either Mr. Carlton or Mr. Harrison.

103.     Mr. Hooker testified that an individual private call not involving police was $55.00 to $85.00.

104.     Defendants assert that plaintiffs were considered salesmen. Mr. Hooker testified that he told his drivers they were salesmen during meetings. He further testified that they were salesman because they wore uniforms and because defendants' names were on the drivers' uniforms and the tow trucks. Mr. Hooker further testified that the drivers deal with customers and that the drivers are instructed to smile and be professional. Mr. Moody testified that JHook advertises services to the public through Facebook postings, a company called NTTS, truckdown.com, and word of mouth.

105.     Plaintiffs' counsel presented Mr. Hooker with his own deposition testimony, and Mr. Hooker conceded that he stated at his deposition that plaintiffs are tow truck drivers, not salesmen (Dkt. No. 45, ¶ 65).

106.     Plaintiffs had no involvement in building defendants' customer relationships, other than performing tows as directed by the dispatchers (Dkt. No. 45, ¶ 63).

107.     Defendants do not employ sales people who try to find more business for JHook (*Id.*, ¶ 64).

108.     JHook never asked its drivers to drive around to look for accidents or broken-down cars to generate business (*Id.*, ¶ 65).

109.     Plaintiffs did not have the right to charge customers more or less than the amount set by defendants for tows (*Id.*, ¶ 67).  Pricing for tows was set by defendants, not plaintiffs (*Id.*, ¶ 68).  Defendants never authorized plaintiffs to change the price of any tow that any of them performed or to tow a vehicle farther than what the customer wanted (*Id.*, ¶ 69).

110.     JHook Investments is part of the Professional Towing and Recovery Association of Arkansas and has been since at least 2012 (*Id.*, ¶ 70).  None of defendants have ever been part of the National Retail Federation, the Retail Industry Leaders Association, or any other retail association (*Id.*, ¶ 71).

111.     JHook and Ivy Hall have business licenses from the Arkansas Towing and Recovery Board (*Id.*, ¶ 72).

112.     JHook and Ivy Hall were under common ownership (*Id.*, ¶ 73).  Mr. Moody was the general manager for both JHook and Ivy Hall (*Id.*, ¶ 74).  Mr. Moody transferred Mr. Carlton from Ivy Hall to JHook (*Id.*, ¶ 75).  JHook and Ivy Hall shared employees (*Id.*, ¶ 76).

113.     JHook dispatchers dispatched Ivy Hall drivers, and Ivy Hall dispatchers dispatched JHook drivers (*Id*., ¶ 77).

114.     Mr. Moody and Mr. Hooker, manager and owner of both JHook and Ivy Hall, had the power to fire drivers (*Id*., ¶ 78).  Mr. Moody hired and fired truck drivers (*Id*., ¶¶ 79-80).  Mr. Moody and Mr. Hooker both set the method and manner of pay for both JHook and Ivy Hall drivers (*Id*., ¶ 81).

## II.     Conclusions Of Law

Plaintiffs allege that, under the FLSA and the AMWA, they are entitled to overtime pay for weeks where their regular hours and after-hours call-out time caused them to exceed 40 hours of work per week and where defendants failed to pay them the appropriate amount of overtime. Because, on the facts of this case, the AMWA does not appear to require clearly different obligations from those imposed by the FLSA, the Court will analyze both claims under the FLSA. *Compare* 29 U.S.C. § 207(a)(1), *with* Ark. Code Ann. § 11-4-211; *see Helmert v. Butterball, LLC*, 805 F. Supp. 2d 655, 663 n.8 (E.D. Ark. 2011); *see also* Ark. Admin. Code 010.14.1-112 ("The department may rely on the interpretations of the U.S. Department of Labor and federal precedent established under the [FLSA] in interpreting and applying the provisions of the [AMWA] . . . except to the extent a different interpretation is clearly required.").

The facts of this case present several legal issues.  First, the Court must determine whether the parties had an employer-employee relationship under the FLSA.  Second, the Court must determine whether Ivy Hall is liable as a joint employer of plaintiffs under the FLSA.  Third, the Court must determine whether plaintiffs are exempt from the overtime requirements set forth in the FLSA under the retail or service establishment exemption or the Motor Carrier Act ("MCA") exemption.  Fourth, the Court must determine whether plaintiffs have met their burden of

demonstrating that they are entitled to unpaid overtime wages. Fifth, the Court must determine what damages, if any, plaintiffs are entitled to receive. The Court addresses these issues in turn.

### A. Employer-Employee Relationship

The existence of an employer-employee relationship is a prerequisite to assert a claim under the FLSA. *See* 29 U.S.C. § 216(b). The Court holds that plaintiffs have met their initial burden of proving that an employer-employee relationship existed between plaintiffs and JHook and Mr. Hooker. *See Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946); *Marshall v. Truman Arnold Distrib. Co., Inc.*, 640 F.2d 906, 911 (8th Cir. 1981)). An employer is governed by the FLSA's overtime requirement if: (1) it has two or more employees engaged in interstate commerce or in the production of goods for interstate commerce or handling, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce, and (2) its annual gross volume of sales made is $500,000.00 or more. 29 U.S.C. § 203(s)(1). Defendants admitted these facts in their answer (Dkt. Nos. 2, ¶¶ 19-20; 6, ¶¶ 19-20).

Under the FLSA, the term "'employee' means any individual employed by an employer" unless certain exceptions apply. 29 U.S.C. § 203(e)(1). "The test of employment under the [FLSA] is one of economic reality." *Karlson v. Action Process Serv. & Private Investigations, LLC*, 860 F.3d 1089, 1092 (8th Cir. 2017) (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)). In their answer, defendants admit that Mr. Carlton and Mr. Harrison entered into an employer-employee relationship with JHook and Mr. Hooker (Dkt. Nos. 2, ¶¶ 21, 37; 6, ¶¶ 21, 37). Based upon these admissions, the Court concludes that an employer-employee relationship existed between JHook and Mr. Hooker, as the employer, and Mr. Carlton and Mr. Harrison, as the employees.

## B.    Ivy Hall As A Joint Employer

Plaintiffs also contend that Ivy Hall is liable to Mr. Carlton and Mr. Harrison as a joint employer under the FLSA and the AMWA.  The Court concludes that Ivy Hall is jointly liable with JHook and Mr. Hooker for Mr. Carlton and Mr. Harrison's alleged unpaid overtime.

The FLSA broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C. § 203(d).  An employee may have multiple employers that are simultaneously liable under the FLSA where the evidence shows that separate persons or entities exercise some level of control over the employee.  29 C.F.R. § 791.2; *Childress v. Ozark Delivery of Mo. L.L.C.*, 95 F. Supp. 3d 1130, 1138-39 (citation omitted).  The FLSA defines the employment relationship "expansively" and with "striking breadth," and it "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  Courts determine employer status under the FLSA by looking to the economic realities of the circumstances.  *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961).  In the Eighth Circuit, this analysis starts with a review of four factors:  (1) whether the alleged employer had the power to hire and fire plaintiffs; (2) whether the alleged employer supervised and controlled plaintiff's work schedules or conditions of employment; (3) whether the alleged employer determined the rate and method of payment; and (4) whether the alleged employer maintained plaintiffs' employment records.  *Childress*, 95 F. Supp. 3d at 1139 (citations omitted).  These factors are not exhaustive, and no one factor is dispositive.  *Id.* (citations omitted).  The overarching concern is whether the alleged employer possessed direct or indirect power to control significant aspects of plaintiffs' employment.  *See Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105, 1115 (S.D. Iowa 2011).

In *Childress*, a district court concluded that Ozark, a company that provided delivery services for domestic packages, and Advantage, an entity that provided "certain off-site human resources," were joint employers. 95 F. Supp. 3d at 1140. There, Advantage admitted that it was a joint employer and "did have a significant role in determining general compensation policies and ensuring [Ozark's] compliance with the FLSA," even though Advantage "did not generate Plaintiffs' weekly schedules, approve their . . . paid time off, or determine their individual rates of pay . . . ." *Id*. at 1144. Furthermore, Advantage maintained the plaintiffs' employment records, including records pertaining to taxes, benefits, and record-keeping. *Id*. at 1145.

Here, the record evidence shows that plaintiffs have met their burden of demonstrating that Ivy Hall was the joint employer of Mr. Carlton and Mr. Harrison. Defendants do not contest the following facts: JHook and Ivy Hall were commonly owned; Mr. Moody was the general manager for both JHook and Ivy Hall ; JHook and Ivy Hall shared employees; JHook dispatchers dispatched Ivy Hall drivers, and Ivy Hall dispatchers dispatched JHook drivers; and Mr. Moody and Mr. Hooker both set the method and manner of pay for both JHook and Ivy Hall (Dkt. Nos. 45, ¶¶ 73, 74, 75, 76, 77, 81; 48, ¶ 1). There is also record evidence that Mr. Moody, the general manager of both JHook and Ivy Hall, hired and fired drivers who worked for JHook and Ivy Hall (Dkt. Nos. 45, ¶¶ 79, 80; 48, ¶ 1).

Based on this record evidence, as to the first factor, the record evidence is clear that Mr. Moody has the authority to hire and fire drivers for both JHook and Ivy Hall. Thus, the first factor weighs in favor of finding that Ivy Hall was a joint employer with JHook. As to the second factor, the record evidence is that Ivy Hall's dispatchers dispatched JHook's drivers, and vice versa, thereby controlling the schedules of drivers who ostensibly worked for a separate entity. The Court finds that this factor weighs in favor of joint employment. As to the third factor—whether Ivy

Hall determined Mr. Carlton and Mr. Harrison's rate of pay—the record evidence indicates that Mr. Hooker set the method and manner of pay for both JHook and Ivy Hall. Thus, this factor weighs in favor of joint employment. There is, however, no record evidence that Ivy Hall maintained employment records for either plaintiff, so this factor weighs against finding that JHook and Ivy Hall were joint employers.

Reviewing all of the record evidence, and noting that no one factor is dispositive, the Court concludes that JHook and Ivy Hall both possessed the power to control significant aspects of plaintiffs' employment. Thus, under the economic realities test, the Court concludes that Ivy Hall is plaintiffs' joint employer with JHook.

## C.    Retail Or Service Establishment Exemption

The parties dispute whether plaintiffs fall within the retail or service establishment exemption and, therefore, are exempt from the FLSA's overtime provision. The FLSA's overtime requirements do not apply to employees who fall within one of the exemptions set forth under the FLSA. An employer claiming an exemption from the FLSA's overtime requirements bears the burden of establishing that the exemption applies. *Corning Glass Words v. Brennan*, 417 U.S. 188, 196-97 (1974). The retail or service establishment exemption of the FLSA provides, in relevant part:

> No employer shall be deemed to have violated subjection (a) by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i).

Plaintiffs argue that they were not employees of a "retail or service establishment." Specifically, plaintiffs assert that defendants' businesses have no "retail concept," but instead are in the business of towing, selling wrecked vehicles, and repairing commercial trucks (Dkt. No. 55, at 25). Plaintiffs argue that defendants' businesses are similar to auto-wreckers, junk dealers, and waste removal services, each of which lack a fundamental retail concept. Plaintiffs also argue that JHook is a member of the Professional Towing and Recovery Association of Arkansas, but none of the defendants have ever been part of the National Retail Federation, the Retail Industry Leaders Association, or any other retail associations. Plaintiffs also assert that the record evidence shows that defendants do not employ salespeople and that plaintiffs did not act as salespeople because they did not look for business, change prices, or engage in "upselling."

In addition, plaintiffs argue that, even if defendants' businesses do include a retail concept, defendants have failed to submit any evidence to establish the percentage of annual revenue attributable to any such retail sales (*Id.*, at 26). Furthermore, plaintiffs argue that they presented affirmative proof—such as the amount of revenue that defendants received from police tow calls— that shows that defendants cannot meet the percentage of annual revenue test necessary to invoke the retail or service establishment exemption (*Id.*, at 26-27).

To decide whether plaintiffs were employed in a "retail or service establishment," the Court must review the FLSA, Department of Labor regulations, and relevant precedent. First, § 207(i) does not define "retail or service establishment." *See* 29 U.S.C. § 207(i). That phrase was defined by 29 U.S.C. § 213(a)(2), but that provision has been repealed. Still, the definition that was codified in 29 U.S.C. § 213(a)(2) has been applied to 29 U.S.C. § 207(i). *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1186 (8th Cir. 1993). Section 213(a)(2) defined "retail or service establishment" as "an establishment 75 percentum of whose annual dollar volume of sales of goods or services (or

of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 U.S.C. § 213(a)(2) (repealed 1989).

Similarly, the DOL's current regulations define "retail or service establishment" as an "establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.312. The regulations explain that "[t]ypically a retail or service establishment is one which sells goods or services to the general public" and "performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process." 29 C.F.R. § 779.318(a). The DOL's regulations also state that "Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." *Id*. § 779.318(b). As an example, the regulations state that the sale of "items like small trucks and farm implements" may be included in the exemption because "they are often distributed in stores or showrooms by means not dissimilar to those used for consumer goods; and they are frequently used in commercial activities of limited scope." *Id*. The same regulations provide examples of retail or service establishments, including: "[g]rocery stores, hardware stores, clothing stores, coal dealers, furniture stores, restaurants, hotels, watch repair establishments, barber shops and other such local establishments." *Id*. § 779.318(a); *see id*. § 779.320 (listing establishments whose sales or service may be recognized as retail).

Thus, the first question is whether defendants' businesses have a "retail concept." *See Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295 (1959) (holding that the retail or service establishment exemption did not apply to a finance company "because there is no concept of retail

selling or servicing" in that industry). The DOL has also promulgated regulations that provide a non-exhaustive partial list of establishments "to which the retail concept does not apply." 29 C.F.R. § 779.317. This list is extensive and includes the following types of businesses: ambulance service companies, auto-wreckers' and junk dealers' establishments, lawyers' offices, medical or dental clinics, roofing contractors, transportation companies, waste removal contractors, and wrecking contractors. *Id*. This list is highly probative to this case, as the services offered by defendants are similar to many of the services listed, such as ambulance service companies, waste removal contractors, and wrecking contractors. The Court notes, however, that other Courts of Appeal have questioned the persuasive power of the DOL's list of industries in section 779.317. *See Alvarado v. Corp. Cleaning Servs., Inc.*, 782 F.3d 365, 366 (7th Cir. 2015) (holding that a window-washing company was a retail service establishment in part because it sold window-cleaning services to the ultimate customers rather than reselling window-washing services).

Neither party cites the Court to any precedent determining whether tow companies have a "retail concept" and qualify as "retail or service establishment." In 1969, a district court in the Eastern District of Arkansas held that an ambulance service was not a "retail or service establishment exemption." *Wirtz v. A-1 Ambulance Serv., Inc.*, 299 F. Supp. 197, 202 (E.D. Ark. 1969). The major portion of the defendant's business in that case was "devoted to local calls from homes to hospitals and hospitals to homes, and carrying bodies to and from funeral homes." *Id*. at 198. Defendant was "the only authorized ambulance service permitted to provide emergency ambulance service within the City of Little Rock" and "[r]equests for ambulance service received by the Little Rock Police Department were . . . referred to defendant 24 hours a day . . . ." *Id*. at 199. Additionally, defendant "regularly . . . receive[d] from *individuals and local officials* emergency requests to respond to vehicular accidents occurring on city streets, state highways, and

interstate highway systems . . . ." *Id.* (emphasis added). The district court concluded that "defendant's ambulance service establishment [wa]s engaged in providing a specialized form of transportation for sick, injured, aged or handicapped persons and as such [wa]s essentially a branch of the transportation industry and [wa]s not within the scope of the 'retail concept' as recognized within the industry." *Id.* at 202 (citing *Mitchell*, 359 U.S. at 290; *Telephone Answering Serv. v. Goldberg*, 290 F.2d 529 (1st Cir. 1961)). Citing *A-1 Ambulance Service, Inc.*, a district court in Georgia determined that "[t]he towing business is very similar to the ambulance business" and held that a towing business fell outside the scope of the retail or service establishment exemption. *Wirtz v. Robinson & Stephens, Inc.*, Civil No. 11,665, 1972 WL 852, at *3-4 (N.D. Ga. June 6, 1972).

Based upon these precedents and the record evidence before the Court, the Court concludes that defendants have failed to meet their burden of proving that the retail or service exemption applies. First, the *A-1 Ambulance Service* case appears to be on-point: there, an ambulance service took calls from private individuals and public officials, and the court concluded that the retail or service establishment exemption did not apply. 299 F. Supp. at 202. The Court agrees that service calls from public officials do not fall within the traditional understanding of a "retail concept." Additionally, defendants failed to present record evidence that at least 75% of their annual dollar volume of sales of goods or services came from retail sales during the relevant period. Furthermore, Mr. Heverly and Mr. Moody were unable to provide estimates of what percentage of their calls came from police departments. Mr. Hooker was unable to testify about the percentage of revenue his businesses accrued from any particular type of work. On the other hand, Mr. Carlton and Mr. Harrison testified that approximately 90% of defendants' revenue came from police or business calls. Based upon this evidence, the Court concludes that defendants have failed to meet

their burden of proof to show that Mr. Carlton and Mr. Harrison were employees of a retail or service establishment. Accordingly, the Court concludes that the retail or service establishment exemption does not apply to Mr. Carlton or Mr. Harrison.

## D. Motor Carrier Act Exemption

Defendants also argue that Mr. Harrison is exempt from the FLSA's overtime requirements because those requirements do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 . . . ." 29 U.S.C. § 213(b)(1). Section 31502 of Title 49 concerns employees of motor carriers and private motor carriers, *see* 49 U.S.C. § 31502(b), and therefore this exemption to the FLSA's overtime requirements is called the MCA exemption. *See McCall v. Disabled Am. Veterans*, 723 F.3d 962, 964 (8th Cir. 2013).

Under the MCA exemption, "motor carrier" and "motor private carrier" employees are excluded from the FLSA's overtime pay provisions. The term "motor carrier" is defined as "a person providing motor vehicle transportation for compensation," and the term "motor private carrier" describes "a person, other than a motor carrier, transporting property by motor vehicle" where: "(A) the transportation is as provided in section 13501 of this title; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. §§ 13102(14), 13102(15), 31501(2). Further, in August 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") went into effect and removed from the definition of "motor carrier" and "private motor carrier" all vehicles weighing less than 10,001 pounds. Thus, employees who drove vehicles weighing less than 10,001 pounds were subject to the FLSA overtime provisions. Then, in June 2008, Congress passed the SAFETEA-LU Technical

Corrections Act of 2008 ("TCA"), which "restored the 2004 definition of a 'motor carrier' but retained the weight limitation for vehicles." *Wells v. Fedex Ground Package Sys., Inc.*, 979 F. Supp. 2d 1006, 1033 (E.D. Mo. 2013).

Most relevant to this case, the TCA retained the 10,000-pound weight limitation established under the SAFETEA-LU in 2005 by including an express provision that extends application of the FLSA's overtime requirements to all "covered employees," notwithstanding the MCA exemption. A "covered employee" as defined in the TCA is "an individual" who satisfies the following three criteria:

(1) who is employed by a motor carrier or motor private carrier . . .;

(2) whose work, *in whole or in part*, is defined—

(A) as that of a driver, driver's helper, loader, or mechanic; and

(B) as affecting the safety of operation of motor vehicles *weighing 10,000 pounds or less* in transportation on public highways in interstate or foreign commerce, except vehicles—

(i) designed or used to transport more than 8 passengers (including the driver) for compensation;

(ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or

(iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and

(3) who performs duties on motor vehicles *weighing 10,000 pounds or less*.

Pub. L. No. 110-244, Title III, § 306(c) (2008) (emphasis added). For TCA purposes, small vehicles are those weighing 10,000 pounds or less, and large vehicles are those weighing more than 10,000 pounds. The weight of a particular vehicle is determined by reference to its GVWR. *McCall*, 723 F.3d at 965.

The question the Court must decide is how work on a "mixed fleet" of vehicles—some of which meet the elements of the TCA exception and some of which do not—should be treated under the TCA's definition of a "covered employee." Courts are split on this question. *See Berry v. Best Transp., Inc.*, Case No. 4:16-cv-00473, 2018 WL 6830097, at *18 (E.D. Mo. Dec. 27, 2018) (collecting cases); *Wilkinson v. High Plains Inc.*, Case No. 1:16-cv-011, 2018 WL 1123863, at *4 (D. N.D. Mar. 1, 2018) (same). In *Childress*, the district court framed the issue as "whether the employee spends more than a de minimis amount of time operating vehicles that weigh less than 10,000 pounds." *Childress*, 95 F. Supp. 3d at 1137 (citing *Wells*, 979 F. Supp. 2d at 1033; *Garcia v. W. Waste Servs., Inc.*, 969 F. Supp. 2d 1252, 1259-60 (D. Idaho 2013); *Bedoya v. Aventura Limousine & Transp. Serv., Inc.*, Case No. 11-24432-CIV, 2012 WL 3962935, at *4 (S.D. Fla. Sept. 11, 2012); *Hernandez v. Alpine Logistics, LLC*, Case No. 08-cv-6254T, 2011 WL 3800031, at *5 (W.D.N.Y. Aug. 29, 2011)). Based on the Court's review, the Eighth Circuit has not addressed this issue.

The Court agrees with other district courts in the Eighth Circuit that the statutory language of the TCA exception more naturally focuses upon the employee's operation of small vehicles, *i.e.*, vehicles 10,000 pounds or less. *See Wilkinson v. High Plains Inc.*, 297 F. Supp. 3d 988, 995 (D. N.D. 2018) ("[I]t logically follows that a worker whose performance of duties on small vehicles is more than de minimis is a 'covered employee.'"); *see also Berry*, 2018 WL 6830097, at *6

(same); *Childress*, 95 F. Supp. 3d at 1173 (same). The TCA clearly defines a "covered employee" as an individual employed by a motor carrier "whose work, in whole or in part, is defined as that of a driver . . . affecting the safety of operation of motor vehicles weighing 10,000 pounds or less . . . ." Pub. L. No. 110-244, Title III § 306(c)(2)(A-C). A natural reading of this language focuses the Court's inquiry on whether a driver operated a vehicle weighing 10,000 pounds or less, not whether the employee operated larger vehicles. Further, this approach is consistent with the reasoning of other circuit courts. *See Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 601 (4th Cir. 2017) ("The structure of the TCA exception also makes clear that an employee need only work on smaller vehicles 'in part' to qualify for overtime compensation . . . ."); *McMaster v. E. Armored Servs., Inc.*, 780 F.3d 167, 168 (3d Cir. 2015) (holding that an employee who drove in a mixed fleet was entitled to overtime protection even though she drove small vehicles only a minority of the time).

Finally, although the Eighth Circuit has not addressed the issue, the Fifth Circuit has held that plaintiffs bear the burden of proving the weight of vehicles in order to qualify for the TCA exception. *Carley v. Crest Pumping Tech., L.L.C.*, 890 F.3d 575, 580 (5th Cir. 2018). Even if the burden of proving that the TCA exception to the MCA lies with Mr. Harrison, the Court concludes that he has met it. Mr. Harrison testified that he drove vehicles with a GVWR of 10,000 pounds or less at Ivy Hall and at JHook's locations in North Little Rock and Lonoke. Mr. Harrison's testimony also indicates that his use of these vehicles was more than *de minimus*: he testified that he drove a vehicle with less than 10,000 pounds GVWR approximately once a week at Ivy Hall, approximately twice a week at the North Little Rock location, and once or twice a week in Lonoke. Mr. Hooker testified that Mr. Harrison's use of such vehicles was infrequent, but he did not quantify what he meant by "infrequent" or provide any other evidence to show that Mr. Harrison's

use of vehicles with less than 10,000 pounds GVWR was *de minimus*.  Based upon this evidence, the Court concludes that Mr. Harrison spent more than a *de minimus* amount of time operating vehicles that weigh less than 10,000 pounds, and therefore, the Court concludes that the MCA exemption does not apply to Mr. Harrison.

### E.     Mr. Carlton And Mr. Harrison's Overtime Wages

Plaintiffs argue that they are entitled to unpaid overtime.  Specifically, plaintiffs argue that they are entitled to overtime pay because their on-duty time—*i.e.*, their regular schedules—and their time spent after-hours taking tow calls forced them to work more than 40 hours per week during certain periods.  Before turning to the question of how many hours plaintiffs worked in any given week, the Court must determine whether plaintiffs are entitled to overtime wages under the FLSA.

### 1.     Knowledge

Under the FLSA, a covered employee is entitled to overtime pay for any time over 40 hours per week that the employee works.  29 U.S.C. § 207(a).  Although the term "work" is not defined in the FLSA, compensable time includes work that is "suffer[ed] or permit[ted]."  *Id*. § 203(g). The FLSA also covers work performed off-duty, including "activities performed either before or after [the] regular work shift . . . if those activities are an integral and indispensable part of the principal activities for which the covered employees are employed."  *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).  An employer who "knows or has reason to believe" that the employee is working overtime is obligated to compensate the employee.  *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997) (quoting *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975)).

115.     Defendants argue that they had no knowledge of plaintiffs' overtime work, to the extent any such overtime work occurred (Dkt. No. 54, at 9).  First, assuming *arguendo* that

plaintiffs were working overtime, the Court will determine whether the defendants or its agents had actual or constructive knowledge that plaintiffs were working overtime. Defendants testified that Mr. Carlton never discussed the issue of the alleged unpaid overtime with either Mr. Hooker or Mr. Moody; Mr. Harrison testified that he objected about pay to Mr. Moody who refused to provide any extra pay. The fact that plaintiffs did not request overtime pay is irrelevant. *Reich*, 121 F.3d at 407 (holding that a plaintiff cannot waive his entitlement to FLSA benefits). Work performed by an employee for the employer's benefit and with the employer's tacit approval is protected by the FLSA. *See Mumbower*, 526 F.2d at 1188 ("Such extra work for the employer's benefit and with his tacit approval must be included in determining whether overtime compensation is statutorily required.").

Plaintiffs claim that their overtime hours were the result of working through their lunch hours and after-hours because they were responding to calls from defendants' dispatchers. Mr. Hooker testified that plaintiffs were paid commissions on each of their calls and that drivers turn in commission sheets in order to collect their commissions for such calls. Accordingly, to the extent plaintiffs did any overtime work for taking calls, the record evidence indicates that defendants would have been put on actual or constructive notice of such work through dispatcher records or the commission logs.

Furthermore, plaintiffs argue that they performed overtime work that was not recorded on commission sheets, including assisting other drivers, releasing vehicles from the impound lot, and running errands for Mr. Moody. To the extent plaintiffs claim that they worked overtime performing tasks that were not memorialized in commission sheets, Mr. Carlton testified that such work included assisting other drivers, releasing vehicles, or running errands for Mr. Moody. Because this work was done on defendants' behalf and, at least at times based on trial testimony,

on Mr. Moody's request, and because there is no contrary record evidence from defendants that leads the Court to conclude that such work was done without notice to defendants, the Court concludes that, to the extent such work was done, defendants were on notice that such work occurred.

The Court concludes that plaintiffs have met their burden of proof that defendants had actual or constructive notice of their overtime work, to the extent any such overtime work occurred.

## 2.    Time Spent On-Call

The FLSA and the AMWA require employees to be paid one and one-half times the regular rate at which the employee is regularly paid if the employee works longer than 40 hours in a given workweek. 29 U.S.C. § 207(a)(1); Ark. Code Ann. § 11-4-211(a). The Supreme Court has stated that an employee's time is work under the FLSA if it is spent "predominantly for the benefit of the employer." *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001) (citing *Armour & Co. v. Wantock*, 323 U.S. 126 (1944)). FLSA regulations state that "an employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.'" 29 C.F.R. § 785.17. On the other hand, an employee is "off duty" in "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes." 29 C.F.R. § 785.16(a).[1] Courts use a "practical approach based on the realities of each case" to resolve this issue. *Reimer,* 258 F.3d at 725.

---

[1] This regulation contains a helpful example:

A truck driver who has to wait at or near the job site for goods to be loaded is working during the loading period. If the driver reaches his destination and while awaiting the return trip is required to take care of his employer's property, he is also working while waiting. In both cases the employee is engaged to wait. Waiting is an integral part of the job. On the other hand, for example, if the truck

In *Reimer*, the Eighth Circuit concluded that an on-call policy requiring employees to be reachable by cell phone or pager, prohibiting employees from consuming alcohol and taking mind-altering drugs, and reporting to work within 20 minutes allowed employees "to pursue a virtually unlimited range of activities" while on call, and thus the time spent by those employees waiting to be called was not compensable under the FLSA. 258 F.3d at 725. In *Cross v. Arkansas Forestry Commission*, 938 F.2d 912, 916 (8th Cir. 1991), however, the Eighth Circuit held that employees were entitled to overtime compensation under the FLSA for time spent subject to being on-call. The on-call policy in that case required all fire protection employees to stay on-call 24 hours per day, seven days per week unless given permission to take time off, as well as requiring on-call employees to monitor all radio communications that only had a range of 35 to 50 miles. *Id*. at 914, 916-17. The Eighth Circuit concluded that this policy was so onerous that employees could not "entertain in their homes, attend social gatherings, attend church services or engage in other personal pursuits . . . ." *Id*. at 917.

The Court concludes that plaintiffs have met their burden of proving that they were on-duty during their regular 8:00 a.m to 5:00 p.m. work schedules and that this time is entitled to protection under the FLSA. First, Mr. Hooker and Mr. Moody both conceded that plaintiffs were paid for their down-time during business hours. Mr. Hooker also testified that waiting and being ready to take a tow call is part of the job. Mr. Carlton testified that, during business hours when he was not working calls, he would mow grass, pick up parts, and perform other duties besides

---

driver is sent from Washington, DC to New York City, leaving at 6 a.m. and arriving at 12 noon, and is completely and specifically relieved from all duty until 6 p.m. when he again goes on duty for the return trip the idle time is not working time. He is waiting to be engaged.

29 C.F.R. § 785.16(b).

driving a tow truck. Furthermore, the record evidence demonstrates that defendants' employees were required to take tow calls during their lunch hours. Mr. Heverly testified that he would have to leave his lunch break to take a tow call if called by the dispatcher, and Ms. Moody, a dispatcher, testified that if there were not other drivers available, she would call a driver during that driver's lunch hour to take the call. Ms. Moody testified that she did not pull drivers away from their lunches often, except for police calls. Mr. Moody also explained that drivers were supposed to take their lunch breaks whenever there was a break between tow calls.

Both Mr. Carlton and Mr. Harrison testified that they were never able to take lunch breaks and that they instead ate while driving. This testimony is not controverted by the other record evidence. Mr. Heverly testified that he saw Mr. Harrison leave to take a lunch and that he recalled Mr. Carlton eating in the break room, but Mr. Heverly also conceded that he did not know how long plaintiffs' lunches lasted. Thus, there is no record evidence that plaintiffs were able to take their full lunch hours; instead, the uncontroverted testimony is that plaintiffs were not able to take their full lunch breaks. Indeed, Ms. Moody, the dispatcher, concedes that she would call drivers during their lunch breaks, especially for police calls. Based upon the record evidence regarding the frequency of phone calls, that drivers would receive calls during their lunch breaks, and that drivers would have to respond immediately during their lunch breaks—rather than wait until their lunch breaks were over to respond—the Court concludes that plaintiffs were engaged to wait for the entire period between 8:00 a.m. and 5:00 p.m. during their regular hours, including during their lunch breaks. Accordingly, the Court concludes that plaintiffs' on-call time from 8:00 a.m. to 5:00 p.m., including lunch breaks, is compensable under the FLSA.

### 3.  Estimated Amount Of Overtime Damages

Plaintiffs argue that they are entitled to unpaid overtime, and defendants argue that plaintiffs have not satisfied their burden to prove unpaid overtime hours.  For the reasons set forth below, the Court concludes that plaintiffs have met their burden to show that they are entitled to unpaid overtime and that the damages estimates they have provided are a reasonable estimate of the amount due to plaintiffs.

 "An employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'"  *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (quoting *Mt. Clemens*, 328 U.S. at 68687).  However, in FLSA cases, the damages need not be precise.  *Mt. Clemens*, 328 U.S. at 688 ("[T]he court may . . . award damages to the employee, even though the result be only approximate.").  Employers are required to keep records of wages and hours for employees subject to the overtime requirements of the FLSA.  29 U.S.C. § 211(c).  "If an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot prove the precise extent of their uncompensated work."  *Holaway*, 771 F.3d at 1059.  In that circumstance, a plaintiff can meet his burden if he "proves that he has in fact performed work for which he was improperly compensated and if he produce[d] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Mt. Clemens*, 328 U.S. at 687.  Where a plaintiff can provide such "sufficient evidence," the burden shifts to the employer "to come forward with evidence . . . to negat[e] the reasonableness of the inference to be drawn from the employee's evidence."  *Id.* at 687-88.

The parties dispute what evidentiary standard applies in this case.  In their post-trial briefing, plaintiffs contend that they are entitled to the relaxed evidentiary standard used in *Mt.*

*Clemens*.  Plaintiffs point out that Mr. Hooker admitted that he has not been able to design an effective way to track after-hours work.  Further, plaintiffs also argue that, while many of Mr. Carlton's commission sheets have been entered into the record, many other commission sheets are missing and that Mr. Carlton performed other after-hours work that was not documented on commission sheets (Dkt. No. 55, at 39).  Plaintiffs also point out that only two of Mr. Harrison's commission sheets have been entered into the record and that the other commission sheets are missing (*Id.*).

First, viewing the record evidence as a whole, the Court concludes that defendants are not entitled to the more stringent evidentiary standard.  Mr. Hooker testified that he did not know how many hours each plaintiff worked, and Mr. Hooker also testified that plaintiffs were paid based upon their commission sheets.  At trial, Mr. Hooker testified that a driver would be the only person to know whether he or she did or did not work overtime.  Mr. Hooker also testified that he has made no efforts to ensure that rollback drivers are not driving more than 40 hours in a week.  Ms. Moody testified that there are people in the business at JHook who could keep logs and know how many calls drivers went out on and what kind of work they did during the day, but she also testified that such individuals were not present at trial.  Mr. Moody confirmed through his testimony that drivers were on-call every other week, and Ms. Moody testified that drivers would have a better understanding of the weekly average number of hours they worked on-call in the evenings and on the weekends.  Mr. Heverly testified that after-hours calls during evenings and weekends varied and that it is hard to measure how many hours he typically works during the evenings and weekends.  Further, he testified that he does not know what other drivers are doing on call-outs or during the night.  Although Mr. Martin testified that he likely never had to work an extra 14 to 21 hours a week, he also testified that he has had to wake up in the night to take between one to three

calls. Mr. Martin confirmed that neither Mr. Moody nor anyone else at the business asks people to keep track of their overtime.

Many of Mr. Carlton's commission sheets are now a part of the record evidence, but an analysis provided by plaintiffs in their post-trial briefing indicates that commission sheets covering approximately 90 days of Mr. Carlton's employment with defendants are missing (Dkt. No. 55-1). Furthermore, while certain of Mr. Harrison's commission sheets are a part of the record evidence, there are no commission sheets for other weeks where Mr. Harrison received overtime pay, which leads the Court to believe that certain commission sheets for Mr. Harrison are missing from the record evidence (*compare* Ex. 4 *with* Ex. 6, at 4). Additionally, Mr. Harrison's December 30, 2016, paystub indicates that his "YTD" commission earnings were $41,351.35, an amount that exceeds the amount of commissions listed on the two commission sheets for Mr. Harrison that are part of the record evidence (Ex. 1, at 2). Based upon this record evidence, the Court concludes that not all of Mr. Harrison's commission sheets are part of the record evidence. Accordingly, based upon the record evidence before the Court and defendants' failure to keep adequate records of the hours worked by plaintiffs, the Court concludes that plaintiffs are not required to meet the elevated evidentiary standard required when an employer maintains adequate records.

Next, the Court turns to the question of the adequacy of plaintiffs' estimates of their unpaid overtime. Briefly, the Court will recount those estimates and then discuss whether they are adequate to provide relief to plaintiffs. Mr. Carlton estimates that, from March 2016 until December 2016, he worked from 8:00 a.m. to 5:00 p.m. for five days each week, including lunch breaks. Mr. Carlton also testified that, during this period, he worked two hours every other weekend. In addition, Mr. Carlton estimates that, during this period, he worked 15 hours of call-out time every other week when he was on-call. In total, for this period, Mr. Carlton estimates that

he worked 45 hours a week on the weeks he was not on-call and that he worked 62 hours per week on the weeks he was on-call. As for the period between December 2016 until February 2017, Mr. Carlton estimates that he worked 45 hours a week because he no longer had to work weekends, but since he was on-call every week and received more calls, he estimates that he worked 26 hours of after-hours calls per week, for a total of 71 hours per week in that period.

Mr. Harrison estimates that, between the week of May 20, 2015, and the week of June 24, 2016, he weekly worked 45 hours of regular time and 9 hours of after-hours call-out time. Mr. Harrison testified that his estimate is based upon his weekly five-day 8:00 a.m. to 5:00 p.m. work schedule and his best estimate regarding the number of after-hours calls he took.

Defendants argue that plaintiffs' estimates are "couched in bare assertions and vague testimony" that must fail even the relaxed evidentiary standard (Dkt. No. 54, at 2). Defendants also argue that plaintiffs' damages estimates are uncorroborated by witness testimony or documentary evidence (*Id.*, at 6). Defendants point out that plaintiffs' estimates "suffer from over-inclusivity" because they include holidays or days off when plaintiffs would not have done any work (*Id.*, at 8). Defendants also argue that plaintiffs' estimates were contradicted by the testimony of their coworkers (*Id.*). Defendants also cite multiple cases for the proposition that plaintiffs' estimates are insufficient to support a finding of unpaid overtime, including: *Shaunpen Zhou v. IBM*, No. 15-CV-1027-LRR, 2017 WL 1217195, at *21–22 (N.D. Iowa Mar. 31, 2017); *Meinke v. S. Paramedic Servs., Inc.*, No. 4:15-cv-448-DPM, 2017 WL 157737, at *1 (E.D. Ark. Jan. 10, 2017); *Rickard v. Hennepin Home Health Care, Inc.*, No. 15-CV-3224, 2016 WL 6089690, at *2–5 (D. Minn. Oct. 17, 2016); *Dalton v. Hennepin Home Health Care, Inc.*, No. 15-cv-1566, 2016 WL 4402801, at *2 (D. Minn. Aug. 16, 2016); *Lindsay v. Clear Wireless LLC*, No. 13-834, 2016 WL 916365, at *8–9 (D. Minn. Mar. 10, 2016); *Santiago v. Saunders*, No. 14-61505, 2015 WL

4454782, at \*2–3 (S.D. Fla. July 20, 2015), *appeal docketed* No. 15-13452 (11th Cir. 2015); *Thompson v. Shock*, Case No. 4:13-cv-735-KGB, 2015 WL 13310487, at \*12–13 (E.D. Ark. June 24, 2015); *Vanhorn v. Tasneem Enter. Inc.*, No. 4:13cv722, 2015 WL 11108881, at \*2 (E.D. Ark. May 13, 2015). Plaintiffs retort that they have "submitted estimates of their weekly hours and specified how many hours were attributable to specific weeks and how many were attributable to working lunches and to after-hours call-out time." (Dkt. No. 56, at 1). Plaintiffs also argue that the commission sheets presented at trial corroborate plaintiffs' estimates (*Id.*).

In *Holaway*, the Eighth Circuit affirmed the district court's grant of summary judgment to the defendant employer because the plaintiff failed "to put forth any evidence regarding specific weeks where he worked beyond forty hours" and "failed to provide a meaningful explanation of how he arrived at his final estimate of sixty hours a week, every week, of his employment." 771 F.3d at 1060. In *Shaunpen Zhou*, the court found that the plaintiff failed to create a "just and reasonable inference" because "the only method that [plaintiff] puts forth to demonstrate the extent of uncompensated time worked is based on mere approximation and [plaintiff] admits that it was not consistently applied." 2017 WL 1217195, at \*21. Similarly, in *Meinke*, the court noted that plaintiff alleged that his employer cut his recorded hours and that he worked hours that were not recorded, but he did not "back these allegations up with any specific dates, supporting documents, or other corroborating information." 2017 WL 157737, at \*1. In *Rickard*, the court found that plaintiff's estimates lacked detail, specificity, and consistency, especially because the plaintiff's payroll records were "not consistent with [her] blanket attestation that she worked numerous overtime hours on non-billable tasks . . . ." 2016 WL 6089690, at \*5 (citations omitted).

In *Dalton*, the court found that plaintiff's estimates were insufficient to meet the relaxed evidentiary standard because she had no documentation showing her hours for any specific week

and because, when asked to identify a specific week when she worked more than 40 hours, she could not cite an example. 2016 WL 4402801, at *2. In *Lindsay*, one plaintiff initially stated that he did not possess or have specific knowledge regarding the number of overtime hours he worked in any given week, but he later testified that he remembered how many hours he worked on certain days. 2016 WL 916365, at *7–8. Further, the same plaintiff failed to explain exactly what he did during the alleged overtime hours. *Id.* at *8. The other plaintiff in *Lindsay* similarly offered contradictory testimony and failed to offer any supporting documents. *Id.* at *9. In *Santiago*, which is currently on appeal, the district court found that plaintiff failed to meet the relaxed evidentiary standard. In that case, plaintiff testified that he sometimes worked through lunch, and his attorney asserted that he worked approximately 50 to 60 hours a week. 2015 WL 4454782, at *2. Plaintiff also based his estimate of uncompensated overtime for a three-year period upon the first few weeks of his work. *Id.*

In *Thompson*, the plaintiff "failed to put forward any evidence of the amount and extent of his on-call work that exceeded 40 hours a week for any specific week he was on call," and instead he "provided contradictory and bare assertions of how he spent his on-call time and of his overtime hours worked while he was on call." 2015 WL 13310487, at *13. In *Vanhorn*, the court granted defendants' motion for summary judgment because plaintiff failed to present evidence that satisfied the relaxed evidentiary standard. 2015 WL 11108881, at *2–3. There, plaintiff alleged that he worked unpaid overtime by performing extra duties; in his complaint, he alleged that he worked 72 hours or more per week. *Id.* at *2. Plaintiff did not produce "any corroborating testimony from a single witness or provide any further documentation . . . to support his overtime claims." *Id.* Further, plaintiff's damages calculations and testimony were inconsistent. *Id.*

Based upon the record evidence, the Court concludes that these precedents are distinguishable. Here, it is undisputed that Mr. Carlton and Mr. Harrison's regular schedules were from 8:00 a.m. to 5:00 p.m. five days a week. Additionally, as discussed above, plaintiffs are entitled to pay for their lunch breaks. In fact, plaintiffs' testimony regarding calls during their lunch breaks was corroborated by the testimony of Ms. Moody, who testified that she would interrupt a driver's lunch if necessary. To the extent there is testimony that plaintiffs were able to take lunch breaks, the Court notes that there is no testimony that plaintiffs were ever able to take their full lunch breaks without interruption. There is no evidence that either plaintiff had holidays or particular days off, so there is no inconsistency with regard to their estimates that include holiday work.

As for plaintiffs' testimony regarding the frequency and timing of their after-hours call-out time, the Court concludes that plaintiffs have presented sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. Plaintiffs specifically identify the amount of unpaid overtime they worked in each week of their employment (*see* Ex. 6). Further, plaintiffs' damages estimates are based upon their available payroll records, which are also a part of the record evidence (*see* Ex. 1). It is true, however, that plaintiffs' estimates of their after-hours work are uncorroborated by any other witness testimony, and the only contemporaneous records of such after-hours work are their commission sheets and payroll records.

The commission sheets before the Court, however, tend to corroborate, rather than discredit, plaintiffs' estimates of their after-hours call-out time. As discussed above, Mr. Carlton estimated that he worked 15 hours of after-hours time every other week when he worked for JHook and Ivy Hall's Lonoke location (*see* Ex. 6). Based upon the commission sheets entered into the record for that time, Mr. Carlton worked an average of 10.04 hours of after-hours time during his

on-call weeks, and he also worked an average of 1.69 hours of after-hours time during the weeks he was not on-call. Additionally, the commission sheets for seven of Mr. Carlton's on-call weeks are missing. This record evidence shows that, even if Mr. Carlton's estimate of 15 hours of after-hours work per week may be high, his estimate likely undercounts the number of after-hours calls he took during the weeks he was not on-call. As for Mr. Carlton's time at JHook's North Little Rock location, there are no commission sheets to corroborate his estimates of the after-hours time he worked while at that location. Mr. Carlton's payroll records for that time are, however, part of the record, and they show that he earned commissions during that period (Ex. 1). While the payroll records do not show whether those commissions were earned after-hours, the Court notes that the commissions earned by Mr. Carlton at JHook's North Little Rock location—$877.13, $533.13, $798.75, $1,263.75—are generally higher than the commissions Mr. Carlton earned while he was working at the Ivy Hall and Lonoke locations. Accordingly, the Court finds that Mr. Carlton has presented sufficient evidence for the Court to conclude that his after-hours time increased at JHook's North Little Rock location. Given the specificity of Mr. Carlton's estimates, the fact that those estimates are generally corroborated by the commission sheets and payroll records, and the Court's determination that Mr. Carlton's testimony was credible, the Court concludes that Mr. Carlton has provided sufficient evidence to show the amount and extent of his unpaid overtime work as a matter of just and reasonable inference.

The Court will use the same analysis described above to examine Mr. Harrison's claims. Similarly, Mr. Harrison's estimates are also corroborated by the two commission sheets he completed that are in the record. One of these commission sheets is for the week Mr. Harrison drove to Las Vegas, Nevada, while the other is for a week in September 2016. A calculation presented by plaintiffs shows that, for the commission sheet for one week in September 2016, Mr.

Harrison worked a total of 13.50 hours of after-hours time (Dkt. No. 55-3). This is greater than Mr. Harrison's estimate of nine hours of such work per week. Furthermore, the Court notes that Mr. Harrison did not have the benefit of his commission sheets when he generated his estimates, yet the commission sheet for September 2016 shows that he worked more call-out time than he estimated. The Court recognizes that Mr. Harrison does not present as much corroborating evidence to prove the amount and extent of his unpaid overtime work as Mr. Carlton. However, based upon the record evidence and the Court's assessment of the credibility of the testimony provided at the hearing, both of which tend to support Mr. Harrison's estimates of his unpaid overtime, the Court concludes that Mr. Harrison has provided sufficient evidence to show the amount and extent of his unpaid overtime work as a matter of just and reasonable inference.

Accordingly, Mr. Carlton has met his burden of demonstrating that the appropriate amount of damages for his unpaid wages is $6,161.26 (Ex. 6, at 1). As for Mr. Harrison, he has met his burden of demonstrating that his damages for his unpaid wages between June 5, 2015 and June 24, 2016 is $7,123.24, and he has demonstrated that his damages for unpaid wages from July 1, 2016, until February 10, 2017, is $11,306.92 (Ex. 6, at 5; Dkt. No. 55-2).[2]

---

[2] The Court notes that Mr. Carlton and Mr. Harrison's damages estimates are based upon defendants' alleged failure to pay them for both the correct number of hours and the correct rate. The Court notes that plaintiffs' damages estimates are accurate because the overtime rate for employees who earn commissions "is determined by dividing the number of hours worked in the workweek into the amount of the [total pay] to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary [and commission] satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary [and commission] arrangement." 29 C.F.R § 778.114; *see* 29 C.F.R. § 778.118 (stating that commissions are added to the base salary to determine a regular rate of pay).

The information used to calculate Mr. Carlton's damages is on page one of plaintiffs' trial Exhibit 6, which lists Mr. Carlton's estimate of the overtime hours he worked during each pay period and the corresponding unpaid overtime wages from March 2016 to February 2017. The information used to calculate Mr. Harrison's damages, in part, is on pages five and six of plaintiffs' trial Exhibit 6, which lists Mr. Harrison's estimate for the overtime hours he worked during each

### F. Liquidated Damages

Plaintiffs also seek a total of $24,591.42 in liquidated damages for willful violations of the FLSA. Under the FLSA, employers who violate the Act are liable not only for unpaid wages but for "an additional equal amount as liquidated damages." 29 U.S.C. § 216(c). The FLSA does, however, allow courts, in their discretion, to reduce the amount awarded in liquidated damages or to eliminate them entirely if an employer proves that its actions were "in good faith and that [it] had reasonable grounds for believing that [its] act or omission was not a violation" of the FLSA. 29 U.S.C. § 260. "[T]he employer bears the burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness." *Reich*, 121 F.3d at 71 (citation and internal quotation marks omitted). The "good faith" requirement is a subjective standard where the employer must establish "an honest intention to ascertain and follow the dictates of the FLSA," and the "reasonable grounds" requirement is an objective standard that the employer's position was "objectively reasonable." *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008) (internal citations and quotation marks omitted). The employer bears the burden of proving he acted in good faith and had reasonable grounds, but the burden is high because single damages are the exception. *Id.* at 941–42. To avoid a liquidated damages award, the employer must show it took affirmative steps to learn the requirements of the FLSA, and the employer's position must be objectively reasonable. *Id.* at 942.

The Court finds that defendants have failed to meet their burden of proof on the good faith defense. There is no record evidence that defendants relied upon any statute, regulation, or

---

pay period and the corresponding unpaid overtime wages from July 2016 to February 2017. The remainder of Mr. Harrison's damages calculation is located on plaintiffs' post-trial Exhibit 2, which addresses the period between June 2015 and June 2016. Exhibit 2 is a correction to plaintiffs' previous calculation for this time period and accounts for evidence introduced at trial.

precedent to support their decision not to pay their drivers overtime compensation in addition to the commissions. Because defendants have failed to demonstrate that they took reasonable efforts to ascertain the requirements of the FLSA in relation to their drivers, plaintiffs are entitled to liquidated damages on their claims.

### III.   Conclusion

For the foregoing reasons, the Court concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, the parties' filings, and the controlling law on the issues presented, that plaintiffs have shown by a preponderance of the evidence that defendants violated the overtime provisions of the FLSA and the AMWA. The Court hereby enters judgment in favor of Mr. Carlton in the amount of $12,322.52, consisting of $6,161.26 in unpaid wages and $6,161.26 in liquidated damages. The Court also hereby enters judgment in favor of Mr. Harrison in the amount of $36,860.32, consisting of $18,430.16 in unpaid wages and $18,430.16 in liquidated damages.

It is so ordered, this the 30th day of September 2019.

_Kristine G. Baker_
Kristine G. Baker
United States District Court Judge
